**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| FIREMAN'S FUND INSURANCE COMPANY, AS SUBROGEE OF RAISIN INDUSTRIES, LLC AND JACK OHIO, LLC;<br><br>Plaintiff,<br><br>v.<br><br>S.A. COMUNALE CO., INC.,<br><br>Defendant, | CASE NO. 5:22-CV-01850-CEH<br><br>JUDGE CARMEN E. HENDERSON<br>UNITED STATES MAGISTRATE JUDGE<br><br><br>**MEMORANDUM OPINION & ORDER** |

**I.  Introduction**

This matter is before the Court pursuant to Defendant S.A. Comunale Co., Inc.'s ("Defendant") motion for summary judgment, filed May 1, 2024. (ECF No. 48). For the reasons explained within, the Court DENIES Defendant's motion.

**II.  Relevant Background**

The parties largely agree on the facts relevant to the current motion. Plaintiff Fireman's Fund Insurance Company ("Plaintiff") provided property insurance to Raisin Industries ("Raisin") for property it owned and operated at the Tower City Avenue Shops ("Mall") in Cleveland, Ohio. (ECF No. 1 at ¶¶ 5-6). Plaintiff also provided property insurance to Jack Ohio, LLC ("Jack") for its Jack Casino ("Casino") located inside the Higbee Building in Cleveland, Ohio. (*Id.* at ¶¶ 7-8).

Terminal Tower is a skyscraper located directly above the Mall and is owned and operated by K&D Management, LLC. (*Id.* at ¶ 9; *see* ECF No. 49 at 2). In 2017, K&D hired Cleveland Construction, Inc. ("CCI") to convert certain floors in Terminal Tower into residences. (*See* ECF No. 49 at 2). CCI subcontracted with Defendant for Defendant to install a fire suppression system.

1

(*Id.*; *see* ECF No. 48 at 1). This project was completed before June 7, 2021. (ECF No. 48 at 2 (citing ECF No. 1 at 2)).

A water loss event involving a Victaulic rigid coupling on the fire suppression system occurred on June 7, 2021. (*See* ECF No. 1 at ¶ 13; ECF No. 7 at ¶ 13). "This led to a significant amount of water escaping the fire suppression system . . . and into the adjacent Mall and Casino." (ECF No. 48 at 2 (citing ECF No. 1)). "As a result of the water loss event, [Plaintiff] paid approximately $33,000,000 to Raisin and approximately $3,000,000 to Jack pursuant to its obligations under its respective insurance policies with each." (*Id.*).

### III. Procedural History

On October 13, 2022, Plaintiff filed its Complaint, alleging Defendant's negligence in installing the fire suppression system caused the water loss event. (ECF No. 1). Defendant filed its answer on November 14, 2022. (ECF No. 7). The parties consented to magistrate judge jurisdiction on January 5, 2023. (ECF No. 11).

Defendant filed the instant motion for summary judgment on May 1, 2024. (ECF No. 48). Plaintiff filed its response in opposition on May 30, 2024. (ECF No. 49). Defendant replied on June 11, 2024. (ECF No. 50).

### IV. Legal Standard

To be entitled to summary judgment, the moving party must demonstrate that there is no genuine dispute as to any material fact and the party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A material fact is one which "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court considers all facts in the light most favorable to the non-moving party. *Lindsey v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). The Court must determine "whether reasonable jurors could find by a

preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Anderson*, 477 U.S. at 252. Importantly, the Court may not "weigh the evidence and determine the truth of the matter." *Id.* at 249.

The burden of demonstrating the absence of a genuine dispute of material fact first rests with the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets this burden, the burden shifts to the non-movant to establish a "genuine issue" for trial via "specific facts." *Id.* at 324. The Court is required to enter summary judgment against a party that "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

**V.     Discussion**

Defendant raises three separate arguments that summary judgment is warranted: (1) Plaintiff paid Raisin and Jack on a volunteer basis such that it is not entitled to subrogation; (2) Plaintiff was obligated to provide evidence of diminution in value to support its claim and has failed to do so; and (3) Plaintiff cannot recover for the claims arising from payment to Jack because the Terminal Tower property was subject to an easement agreement containing a waiver of subrogation clause. (ECF No. 48 at 2-3).

   **A.  Payment as a Volunteer**

Pointing to an exclusion provision in the relevant insurance policies, Defendant argues that because "[b]oth the Raisin Policy and the Jack Policy do not cover loss caused by alleged defective construction or workmanship" and Plaintiff "has alleged that the subject water loss was caused by negligent construction or workmanship" of Defendant, Plaintiff "paid these excluded causes of loss as a volunteer and has no right to subrogate against [Defendant]." (ECF No. 48 at 8).

3

Plaintiff responds that it "did not voluntarily make payments to its insured" but rather "made payments under a legal obligation and therefore may exercise its subrogation rights against Defendant." (ECF No. 49 at 4). Plaintiff asserts that "Defendant's failure to properly assemble the Coupling during the installation of the fire protection system caused the damage to the Mall and the Casino" and "[t]his faulty workmanship is a covered loss under the policies for two reasons: (1) the work was neither completed nor contracted for by Raisin or Jack; and (2) the cause or loss resulted in a covered cause of loss." (*Id.* at 6-7). Specifically, Plaintiff argues that "even assuming that the cause of loss—the faulty workmanship by Defendant at a separate property—does fall within the exclusion . . ., it is nonetheless covered due to an *exception* to this exclusion." (*Id.* at 8).

Defendant replies that Plaintiff "fails to point to language within the Exclusion indicating that the alleged defective workmanship must stem from the insured's property." (ECF No. 50 at 1). Concerning the exception, Defendant argues that Plaintiff bears the burden of showing that the exception applies but it failed to point to "specific policy language to show the water loss in this case was a covered cause of loss." (*Id.* at 2-3).

In addressing the Defendant's argument, the Court must first address whether Plaintiff is entitled to subrogation.

> "In a broad sense, one person is subrogated to certain rights of another person where he is substituted in the place of such other person so that he succeeds to those rights of the other person." *State v. Jones* (1980), 61 Ohio St.2d 99, 100–101, 15 O.O.3d 132, 133, 399 N.E.2d 1215, 1216–1217. To be entitled to the right of subrogation, the person who pays money to satisfy the obligation must be under some duty or necessity in order to protect himself from loss; the right cannot extend to a mere volunteer. "Subrogation is allowed only in favor of one who has been obliged to pay the debt of another, and not in favor of one who pays a debt in the performance of his own primary obligation." *Maryland Cas. Co. v. Gough* (1946), 146 Ohio St. 305, 32 O.O. 365, 65 N.E.2d 858, paragraph three of the syllabus.

4

*PIE Mut. Ins. Co. v. Ohio Ins. Guar. Assn.*, 611 N.E.2d 313, 316 (Ohio 1993). Thus, the relevant question is whether Plaintiff was under an obligation to pay claims resulting from the water loss. To determine whether an obligation existed, the Court looks to the insurance policies.

> "An insurance policy is a contract." *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, ¶ 9. When interpreting a contract, "the role of a court is to give effect to the intent of the parties to the agreement." *Id.* at ¶ 11. We thus "examine the insurance contract as a whole and presume that the intent of the parties is reflected in the language used in the policy." *Id.*, citing *Kelly v. Med. Life Ins. Co.*, 31 Ohio St.3d 130, 509 N.E.2d 411 (1987), paragraph one of the syllabus. When contractual language is clear, we look no further than the writing itself to determine the parties' intent. *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 246, 374 N.E.2d 146 (1978).

*EMOI Servs., L.L.C. v. Owners Ins. Co.*, 208 N.E.3d 818, 822 (Ohio 2022).

Here, each insurance policy includes the following exclusions provision:

IV. Exclusions

    A. Exclusions Applicable to all Coverages: We will not pay under Property Coverage, Business Income and Extra Expense Coverage, or any Extensions of Coverage, for any loss, damage, or expense caused directly or indirectly by or resulting from any of the following excluded causes of loss; such loss or damage is excluded regardless of any other cause or event that contributes or in any sequence to the loss:

        1. Regardless of how the cause of loss occurs, we will not pay for direct physical loss, damage, or expense caused by or resulting from the following causes of loss:

        . . .

        2. If a cause of loss which is excluded below causes or results in a **covered cause of loss**, then we will pay for the direct physical loss or damage caused by or resulting from **such covered cause of loss** up to the Limits of Insurance stated in the Declarations:

      . . .

            b. Errors, Omissions, Acts or Decisions

        Errors or omissions in, or faulty, inadequate or defective:

5

>> (1) Manufacturing, processing, installation, research or development or testing operations
>
> . . .
>
> > (4) Specifications; design; planning; zoning; development; surveying; siting; grading; compaction; maintenance; workmanship; repair; or materials used in repair, construction, renovation, or remodeling except if **collapse** is caused by or results from this cause of loss, but only if such cause of loss is hidden or is not known by you prior to such **collapse**;
>
> . . .
>
> which results in loss or damage to **Property Insured** under this Coverage Form.

(ECF No. 48-1, PageID #: 2092-94 (Raisin Policy); ECF No. 48-2, PageID #: 2099-2101 (Jack Policy)).

The Court concludes that a question of fact exists as to whether Plaintiff was obligated to pay the water loss claims under the policies. The language of the policies indicates that there are occurrences where Plaintiff will not pay "[r]egardless of how the cause of loss occurs" but states that if certain excluded causes of loss "cause[] or result[] in a **covered cause of loss**, then [Plaintiff] will pay for the direct physical loss or damage caused by or resulting from **such covered cause of loss**." (*Id.*). The exclusion Defendant cites concerning faulty workmanship falls into the second provision such that if the faulty workmanship resulted in a covered cause of loss, Plaintiff would be obligated to pay for the direct physical loss or damage. (*See* ECF No. 48-1, PageID #: 2092-94). Said another way, if Plaintiff establishes at trial that water damage is a covered cause of loss under the policies and shows that Defendant's conduct caused or resulted in the water damage, Plaintiff would have been obligated to pay Raisin's and Jack's claims under the policies. Under the policies, "[c]overed cause of loss means risks of direct physical loss or damage not excluded or limited in this Coverage Form." (ECF No. 49-2, PageID #: 2227). Neither party has pointed

6

to—nor has the Court found—language in the policy that would indicate water damage would *not* be a covered cause of loss. Thus, a question remains as to whether Plaintiff paid under an obligation and is entitled to subrogation, rendering summary judgment improper.

**B. Proof of Damages**

Defendant argues that Plaintiff "has failed to present any evidence whatsoever regarding the fair market value of the real property involved before and after the loss, and therefore cannot or has not presented any evidence to prove its claimed damages." (ECF No. 48 at 8). Relying on *Ohio Collieries Co. v. Cocke*, 140 N.E. 356 (Ohio 1923) and *Martin v. Design Construction Services, Inc.*, 902 N.E.2d 10 (Ohio 2009), Defendant argues that Plaintiff "is required to show proof of diminution in value as a result of the loss for its claimed damages to the Mall and the Casino as commercial property in order to prove its repair costs it now seeks . . . are reasonable." (*Id.* at 9). Defendant argues that Plaintiff can only offer the required evidence through expert testimony and asserts that "[w]ithout this evidence, the reasonableness of restoration costs cannot be determined" and Plaintiff cannot prove its claim. (*Id.*).

In response, Plaintiff challenges Defendant's reliance on *Martin*, arguing that "the limitation of *Martin* to noncommercial cases has since been clarified by numerous cases, most notably *B & B Constrs. & Developers, Inc. v. Olsavsky Jaminet Architects, Inc.*, 984 N.E.2d 419 (Ohio Ct. App. 2010)." (ECF No. 49 at 9). Plaintiff asserts that "[t]he *Martin* court made no distinction between commercial and noncommercial real property but merely addressed the narrow question before it, which related to noncommercial real property." (*Id.* at 10). Based on *B & B Construction*, Plaintiff argues that it "need only show that its repair costs were reasonable which it can due [sic] through estimates and testimony from its damages consultants." (*Id.* at 11). Further, Plaintiff argues that even if it "were required to proffer evidence of diminution in value, expert

7

testimony would not be required" because "Ohio has long-recognized the 'owner-opinion rule,' whereby 'an owner of real property, by virtue of his ownership and without qualification as an expert, is competent to testify to his property's fair market value.'" (*Id.* at 12 (quoting *Ohio Env't Dev. Ltd. P'ship v. Envirotest Sys. Corp*, 478 F. Supp. 2d 963, 976-77 (N.D. Ohio 2007))).

Defendant replies that "while certain Ohio Appellate districts have given their own interpretation of the ruling in *Martin* specific to whether diminution in value required [sic] for commercial property, the Ohio Supreme Court's ruling in *Ohio Collieries* **has not been overruled** and the only narrow exception applies to **temporary injury to noncommercial** real estate only." (ECF No. 50 at 4).

A review of the cases cited by the parties is warranted. In *Ohio Collieries*, the Ohio Supreme Court set out the proper measure of damages for injury to real property:

> If the injury is of a permanent or irreparable nature, the measure of damages is the difference in the market value of the property as a whole, including the improvements thereon, before and after the injury. If the injury is susceptible of repair, the measure of damages is the reasonable cost of restoration, plus reasonable compensation for the loss of the use of the property between the time of the injury and the restoration, unless such cost of restoration exceeds the difference in the market value of the property before and after the injury, in which case the difference in market value becomes the measure.

*Ohio Collieries*, 140 N.E. at 359. Notably, the *Ohio Collieries* court did not distinguish between commercial and noncommercial property in setting forth the measure of damages.

The Ohio Supreme Court revisited this rule in *Martin*, where it addressed the following certified question: "in an action for temporary damages to a noncommercial real property, is a failure to prove the difference between the fair market value of the whole property just before the damage was done and immediately thereafter fatal to the claim?" *Martin*, 902 N.E.2d at 11 (alterations omitted). The *Martin* court recognized the rule set forth in *Ohio Collieries* but observed

8

that subsequent decisions "implicitly limited the holding" of that decision. *Id.* at 14. The *Martin* court then went on to answer the certified question in the negative, explaining:

> The rule expressed in *Ohio Collieries,* that damages for temporary injury to property cannot exceed the difference between market value immediately before and after the injury, is limited. In an action based on temporary injury to noncommercial real estate, a plaintiff need not prove diminution in the market value of the property in order to recover the reasonable costs of restoration, but either party may offer evidence of diminution of the market value of the property as a factor bearing on the reasonableness of the cost of restoration.
>
> While evidence of loss in market value of the property may be relevant, the essential inquiry is whether the damages sought are reasonable. Either party may introduce evidence to support or refute claims of reasonableness, including evidence of the change in market value attributable to the temporary injury. But proof of diminution in value is not a required element of the injured party's case.

*Id.* at 15 (paragraph numbering omitted).

Relying on *Martin*, the Seventh District of the Ohio Court of Appeals concluded in *B & B Construction* that "*Ohio Collieries* is no longer good law" because the *Martin* court "excised the diminution requirement of *Ohio Collieries*." *B & B Constrs.*, 984 N.E.2d at 433-34. The appellate court observed that "[a]fter *Martin*, courts addressing the issue have concluded that there is no reason to *distinguish* between commercial and non-commercial property for purposes of proving that repair costs are reasonable and thus have refused to require diminution in value evidence as a mandatory element of damages for temporary damage to commercial realty." *Id.* at 434 (collecting cases). The appellate court concluded that "a plaintiff's failure to present evidence on diminution in value does not destroy its entire case" and "[a]s the *Martin* court stated, *the defendant* can choose to present evidence on the fair market value prior to the injury and the fair market value after the injury if it believes that such amount is less than the restoration cost and if it believes it would help show that the repair was not reasonable." *Id.*

9

The Court agrees with Plaintiff's reading of *Martin* and concludes that Plaintiff is not required to show evidence of the fair market value of each property before and after the damage. Consistent with *Martin*, Plaintiff "need not prove diminution in value in order to be awarded damages for temporary injury to property." *Martin*, 902 N.E.2d at 13. However, "either party *may* offer evidence of diminution of the market value of the property as a factor bearing on the reasonableness of the cost of restoration." *Id.* at 15; *see Monroe v. Steen*, 2009-Ohio-5163, ¶ 23 (Ohio Ct. App. Sept. 30, 2009) ("[W]e hold that failure to provide proof of the diminution of market value of the building is not fatal to the injured party's claim for restoration damages. As in *Martin*, either party may offer evidence of the reduction in market value occasioned by the alleged unworkmanlike conduct so that it may be considered by the trial court in rendering its ruling on the damage award."). Thus, Plaintiff's failure to provide evidence of the fair market value of the relevant properties before and after the damage occurred does not warrant granting summary judgment.

### C. Waiver of Subrogation

Defendant argues that K&D, as owner of Terminal Tower, and Jack, as owner and operator of the Higbee Building, "are subject to the terms of the Higbee-Tower City Easement Agreement" ("Agreement"), specifically a waiver of subrogation clause within the Agreement. (ECF No. 48 at 12-13). Defendant argues that because it "had permission from K&D to perform this work and was an agent to K&D through CCI when it completed its subcontracting work on the fire suppression system," it was a "Permittee" under the Agreement and is entitled to the benefits of the Agreement, including the waiver of subrogation. (*Id.* at 14). Accordingly, Defendant argues that Plaintiff's claims based on payment to Jack are barred.

10

Plaintiff responds that "the specific waiver of subrogation in the Easement is only applicable to the parties to the agreement and defendant has not established that either Jack or Comunale are parties to the agreement." (ECF No. 49 at 13). Plaintiff argues that while the Complaint indicated Jack owned and operated the Casino, Defendant "cannot point to anything in the record to support that Jack is either the owner of the Higbee building or a direct successor in interest to any of the parties identified in the Easement." (*Id.* at 14). Even if Jack were bound by the Agreement, Plaintiff argues that Defendant "offers nothing to support its interpretation of the waiver of subrogation as a 'benefit granted' under the Easement that has been extended to [Defendant] by any Party to the Agreement" and even if Defendant was a Permittee under the agreement, "there is no evidence that any Party has actually extended any specific benefits of the easement to [Defendant]." (*Id.* at 15-16).

Defendant replies that even if Jack does not own the Higbee building, "Jack holds a tenant/occupant status of the Higbee Building, which is included in the definition of Permittee, attaching the Higbee Building side of the Agreement." (ECF No. 50 at 8). Defendant argues that the Agreement "contemplates the benefits passing to successor owners of the land as well as their permittees" such that an explicit grant from the property owner was not required. (*Id.*). Defendant argues that because the Agreement is applicable to both Jack and Comunale, "the Waiver of Subrogation provision applies to Comunale and [Plaintiff's] subrogation action is barred." (*Id.* at 9).

> An easement is "the grant of a use on the land of another." *Alban v. R.K. Co.,* 15 Ohio St.2d 229, 231–232, 239 N.E.2d 22 (1968). When an easement is created by an express grant, as here, the extent of and limitations on the use of the land depend on the language in the grant. *Id.* at 232, 239 N.E.2d 22. When the terms in an easement are clear and unambiguous, a court cannot create a new agreement by finding an intent not expressed in the clear language employed by the parties. *See Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 246, 374 N.E.2d 146 (1978). The language of the easement, considered in light of the surrounding

11

circumstances, is the best indication of the extent and limitations of the easement. *Lakewood Homes, Inc. v. BP Oil, Inc.,* 3d Dist. Hancock No. 5–98–29, 1999 WL 693152, * 2 (Aug. 26, 1999), citing *Apel v. Katz,* 83 Ohio St.3d 11, 17, 697 N.E.2d 600 (1998).

*State ex rel. Wasserman v. Fremont*, 476, 20 N.E.3d 664, 669 (Ohio 2014).

Here, the Agreement sets forth the following:

(vi) <u>Waiver of Subrogation</u>. Notwithstanding anything to the contrary contained elsewhere in this Agreement, or prohibited by law, no Party shall be liable to any other Party or to any insurance company insuring any other Party by way of subrogated rights, or otherwise, for any loss or damage insured under the required property insurance, or any resulting loss of income, even though such loss or damage may have been occasioned by the negligence of such Party, its agents or employees. Each Party agrees that each of its policies will include the waiver as set forth in this Section.

(ECF No. 49-4, PageID #: 2580-81). Defendant asserts that it was a Permittee, which under the Agreement "means all tenants, sub-tenants or other occupants of Parcels and their respective officers, directors, employees, agents, partners, contractors, customers, visitors, invitees, licensees and concessionaires." (*Id.* at PageID #: 2554). Defendant relies on the following provision to support its argument that as a Permittee, the waiver of subrogation applies to it:

Q. <u>Benefit of Easements.</u>

Each grant of an easement or right hereunder shall inure to the benefit of the owner or owners of the Dominant Parcel or Parcels, their successors, assigns and Permittees and may be used and enjoyed by the owner or owners of the Dominant Parcel or Parcels and their successors, assigns and Permittees.

No grant of an easement in this Agreement shall be construed to create any rights in or for the benefit of the general public or any person other than a Party to this Agreement; it being the intention of the Parties that this Agreement shall be strictly limited to and for the purposes herein expressed. The owner of any Parcel may, however, extend the benefit of the easements created by this Agreement to each of its Permittees, but such grant shall be subject to the provisions of this Agreement.

(*Id.* at PageID #: 2573).

The Court disagrees with Defendant's interpretation of the Agreement. The language of the waiver provision indicates that no *Party* to the agreement shall be liable to the insurance company of another *Party* by way of subrogated rights. (*Id.* at PageID #: 2580). Thus, for this provision to apply to Defendant, Defendant itself must be a Party as defined in the agreement. The "Parties" to the Agreement are Tower City Infocom Center, LLC; Forest Bay Tower City, LLC; Tower City Avenue, LLC; Terminal Tower SPE, LLC; and Tower City Development, Inc. (*Id.* at PageID #: 2546-47). The terms of the Agreement provide that these Parties' "rights and obligations" may only be assigned to another by (1) "transfer of Ownership of a Parcel" or (2) "prior written consent of all other Parties." (*Id.* at PageID #: 2583-84). Defendant does not claim ownership of the relevant parcels such that the relevant question is whether a Party assigned Defendant the rights and obligations of the Agreement.

Defendant's reliance on the "Benefits of Easements" provision to argue that *all* Permittees are assigned the rights and obligations of the Agreement without an express grant is inconsistent with the language of the Agreement. Of relevance, this provision indicates that "[t]he owner of any Parcel *may* . . . extend the benefit of the easements created by this Agreement to each of its Permittees, *but such grant shall be subject to the provisions of this Agreement*." (*Id.* at PageID #: 2573 (emphasis added)). The use of "may" indicates that the grant is not automatic based on Permittee status and the fact that the grant is "subject to the provisions of th[e] Agreement," when read with the assignment provision, requires that any grant be with "prior written consent of all other Parties." (*See id.* at PageID #: 2583). Thus, Defendant's status as a Permittee does not mean that the waiver provision applies to it.

Because Defendant has not shown that it is entitled to benefit from the waiver of subrogation provision of the Agreement, summary judgment is not warranted.

**VI.     Conclusion**

Based on the foregoing, the Court **DENIES** Defendant's motion for summary judgement.

Dated: August 9, 2024

s/ *Carmen E. Henderson*
CARMEN E. HENDERSON
U.S. MAGISTRATE JUDGE
